Our final case for the morning, Federal Trade Commission v. Hackensack Meridian Health, Appellate Number 21-2603. Good morning, Your Honors. I'm Aaron Van Oort, representing the hospital appellants. I'd like to reserve four minutes of time for rebuttal, if I may. You're granted. This Court should dissolve the injunction against the merger because it rests on a geographic market that's improper as a matter of law. The District Court certified a patient-based price discrimination market, even though it's undisputed that hospitals do not discriminate against patients based on where they live. The FTC also can't switch to a hospital-based market on appeal because in the District Court it expressly said it wasn't proposing that market, so it wouldn't have to justify why it was excluding so many competitors. The reality of this case is that northern New Jersey is so densely populated and there are so many nearby hospitals that any realistically drawn geographic market will show that there's no harm to competition here. The only thing that's going to happen if these hospital mergers is that Englewood is going to have the competitive benefits, the benefits to patients, new facilities, and improved quality that the District Court found. For that reason, we're arguing for your honors to reverse the injunction on this. I want to start out with the patient-based market that was proposed below. As we pointed out in the brief, there's only one way that you can limit a market based on where customers are or patients are, and that is if it's a separate market because you can price separately to those patients. It's undisputed here that the hospitals don't do that and they reasonably cannot do that. Nobody limits their pricing and has a separate price just for Bergen County. They price the same everywhere, and this is true because with employers, you imagine employers trying to go to their employees and saying, well, you're going to pay a different price for your premiums here because we're paying a different price for you. Nobody does it. It hasn't ever been done. And the only reason that the FTC is doing this is so it can artificially shrink the market and look at only half of the patients. But even your expert, though, your expert's own kind of views of what might be within bounds for a market seem pretty similar because it was doing things like based on drive time, correct? Yeah. Your honor, we said a patient-based market is improper at all because there's no price discrimination. It's not a separate market. That's the point here. What our experts showed, though, is that even if you take that approach and actually center the market on these merging parties and do a 20-minute drive time, you don't have the presumptive antitrust case. It's not highly competitive. And this is the basic point, your honor, which is that there's so much competition around here that any realistic market drawn around these merging parties will show that there's no harm to competition. It's not highly competitive. So if you do 20-minute drive times, which is what this court referred to as a basic principle in Hershey, it's not highly competitive. It's not highly concentrated, rather. If you use their primary service areas, it's not highly concentrated on that. Any realistic measure shows that this isn't going to harm concentration on that. On this one, which is why on appeal, your honors, what the FTC is doing is saying, well, never mind the patient-based because we realize that we have a problem there on no price discrimination. Let's define it just by the hospitals that are in Bergen County. Well, why do they have to have price discrimination? You argued the guidelines, it seems. Yeah, the other two things we argued, your honor, there's the Second Circuit decision, Eastman-Kodak, that rejected a customer-based market. A little bit different case, though, and that was the basis upon which they proceeded was on price discrimination. Oh, that's right, your honor. They said that we're trying to define this market based on price discrimination. They don't have to. There's nothing that says they have to define it on price discrimination. Well, the Second Circuit made it pretty clear that if you're trying to do a customer-based market, you need price discrimination. We cited the In re Donnelly case from the commission itself before there, and they rejected a price discrimination market without price discrimination. And, I mean, the antitrust principle behind it, the economics, the FTC never takes on at all, which is that the only way that you can look at just a sub-portion of customers and have that be accurate is if you can price separately to them. Because if you have to raise your prices across the board in order to raise prices just for the target market, then you're affected competitively across the board. So if we take your argument to where I think it only could lead, you're saying there could be no proper market defined when you're dealing with hospitals because they don't price discriminate. No, I don't think. Isn't that what you're saying? And you're saying that that would immunize that industry from antitrust evaluation if the predicate is price discrimination. No, no, not at all, Your Honor. What we're saying is that you have to define the market boundaries based on competitors. Because, I mean, that's the bedrock antitrust principle. The purpose of drawing a market, you have to have a market to prove an antitrust case. The purpose of drawing the market is to include the entities that are the significant price constraints on that. So what you have to do is you have to look here, for example, with Englewood and HUMC, and say, who are the hospitals nearby that are really constraining their prices? Who are their competitors? Englewood constrains HAC and SAC because they view each other as competitors, yes? Well, anytime that you have two companies merging in a market, that competition is lost. But the question is, for defining the market as a whole, who else is there? Who else are the competitors that are constraining? So who do you want us to look at? Yeah, Your Honor, for Englewood, you at least would need to look at St. Joseph's, which is nearby, St. Mary's, Hudson Regional. All of those would get more patients if this were to go according to the FTC's own numbers in Bergen County, Bergen-Newbridge. And for HUMC, you need to look at other academic medical centers. So RWJ St. Barnabas, Newark Beth Israel, New York Presbyterian are the other big academic medical centers. Now let me... Let's stick to the test a little bit before we get too far afield. The geographic market. Right. Do you think that they established the prima facie case on their geographic market? No, because they drew the market wrong, Your Honor. Because of what? They drew the market wrong, because they... Because of, okay. They drew it based on patients, which is the wrong way to do it in this market. They should have drawn it based on hospitals, but Dr. Daphne expressly said... But there's obviously there's ample evidence in the record that the combination, this merger is going to give the merged hospital more leverage in negotiations with the insurance companies. Actually, Your Honor, the record is directly the opposite on that. And I'm glad you brought it up, because here's the direct testimony. This is at pages 45 and 46 of our brief. The testimony was unanimous, number one, that none of the insurers named Englewood, and number two, that adding Englewood to HUMC will not change the leverage. We cite it there at Horizon. Blue Cross is the biggest one. That's at Appendix 273. The others, who I'm not going to mention because of confidentiality, but the other two are at Appendix 505 and 06 and Appendix 885 and 88. What I think Your Honor is referring to is the testimony that you can't market a plan to Bergen County without a hospital in Bergen County. Do you agree with that? No, we aren't disputing that as a factual matter. That was a factual finding. We don't do it. That doesn't answer the question, though, because it doesn't answer whether it's the right market. Yeah, but if you can't market a plan without a hospital in Bergen County, doesn't that give the hospitals more leverage? No, because that's talking about the market definition. Is the market big enough to be economically safe? That's the geographic market. That's testimony that's relevant to the geographic market question. Yes, it is necessary but not sufficient, and here's the way you put it. The hypothetical monopolist test measures whether the market is too small, whether it's not big enough. But it has to be big enough, and it has to fit this transaction. So you could draw all sorts of markets that are big enough around these parties and swivel it like you could draw a market around Manhattan and everybody would say you need a hospital in Manhattan, but it would be a terrible fit for this merger. The question you have to both show that it's significant and that it contains the competitors that will constrain these parties, Englewood and HUMC. That's the missing piece here. Nobody did the analysis. Dr. Daphne admitted, and the district court found, that she never analyzed whether Bergen County includes the hospitals that are the closest constraints on these parties. That's the missing piece. It's not a big, small question. It's a right fit question. And this didn't come up in Hershey, Your Honor, because there it was Harrisburg, and it encompassed four counties, and all the hospitals are trying to do is say you've got to go an hour out. Nobody's saying you've got to go an hour out here. This would be like analogous in Hershey as if they had drawn the market to include Harrisburg but cut out the city of Hershey, right? Draw a line right through a dense urban area. What's happening here is they're drawing a line right through a dense area. For some reason they're willing to go west but not willing to go south. Why not? But my understanding was that the way that the expert looked at the market was where Bergen County residents were getting care, and it wasn't just in Bergen County. It was in the areas that you suggest. Exactly. It begs the question, doesn't it? I don't know. No, I'm saying it begs the question. They start out with the assumption that Bergen County is the right place, and they say lots of people in Bergen County go there. That's the wrong question. The right question is who are the competitive constraints on these hospitals? Well, these two entities saw each other as competitors. Oh, yeah? Correct? And other testimony in the record, some of which may be under seal, suggested that others who were in the same geographic area also saw them as competitors. Yes. They did view each other as competitors. Not the only competitors, not the closest competitors. Do you mean closest by proximity, geography? Yeah. Do you mean proximity-wise? I'm talking there are all sorts of measures of closeness here. Some is drive time, which people say is relevant. Other is who did insurers view as comparable. So, for example, HUMC is an academic medical center that offers these complex quaternary care, like organ transplants. The real constraints on that are the other AMCs that offer that. When you said closest, did you mean not the primary competitors, or did you mean closest competitors? I mean that there are a lot of ways to measure it. So one way is these diversion ratios, which is really a stage two. It's how do the patients choose. Another closest competitor, though, and the one that's most relevant here because insurers choose their networks, who's the closest competitors from the insurers? If you don't have HUMC that can do the organ transplants, who can you get to do those? Well, that's like Newark Beth Israel. That's our W.J. Barnabas. That's there, right? If you don't have HUMC, you have to have those. Englewood doesn't constrain HUMC for the insurers. HUMC costs twice as much, right? They aren't effectively constraining their prices. That's what I mean. If you're asking is the market drawn correctly, it has to do two things. It has to be big enough to be significant. That's the hypothetical monopolist test. And it has to include the competitors who will actually constrain you. And here that analysis wasn't done. Let's go back one step. You say the geographic market is not drawn – the geographic patient market is not drawn properly and it didn't make a prime official case. What about the hospital market? Nobody addressed that. The geographic hospital market. Certainly the FTC addressed it. Their expert may not have directly addressed it in their testimony or their report, but the FTC addressed it. Here's what happened, Your Honor. They measured whether the six hospitals in Bergen County were big enough to matter. Correct. Dr. Daphne expressly testified, and the district court found that she never asked the question, never did the analysis whether that included the white competitors. Right. That's there. And in terms of what the FTC proposed below, this is where it's really material. It was frankly confusing when we got their complaint what market they were doing. Are they talking about patients or are they talking about hospitals? And this is going really fast. But then we got Dr. Daphne's rebuttal report. So this is at the end of April. And she expressly said, my market includes all hospitals inside and outside of Bergen County, the Bergen County visits. That's Appendix 688. And then because we had filed our brief before they had filed their expert report, we were like, we're not sure what you're doing here. So we said, if you're limiting it to the hospitals in Bergen County, that's too narrow and you haven't justified that. They came back in their reply brief and said, that's a mischaracterization of our market. This is page Supplemental Appendix 568 and 569. They said, we made the incorrect claim that the FTC's Bergen County market excludes all hospitals outside of Bergen County. They said, this is a mischaracterization. And this is what Dr. Daphne said. The FTC thought its strongest case here was to do just the patients in Bergen County, but all the hospitals that served them, so they didn't have to justify why they would exclude them. That's what they thought their strongest case was. So we took them on and after getting this, we went to the hearing. We're on the clock. We responded to that. So there aren't any fact findings. If you're going to draw this based on hospitals, who are the right competitors? Why isn't St. Joe's in here? Why isn't St. Mary's in here? They're so close and they're high diversion ratios. But I thought that the way that was defined for the district court on the hospital perspective were hospitals in Bergen County, as opposed to hospitals serving Bergen County residents. Am I correct? Yeah. So there was a definition that they just chose within the borders of Bergen County was the hospital-based. Yeah. Let me make this clear. So there's only one market proposed by FTC. That is the patients in Bergen County and all the hospitals, whatever, that serve those patients. That was the one market. The district court found one market, the FTC proposed market. That's it. They said if we take that market and we've justified drawing the boundaries to Bergen County by looking at patients, then we can measure the shares two ways. We can measure the patient-based share or we can measure a hospital-based share. And they said either way you measure the shares, you get to the same place. They used it as a sensitivity check. That's the district court footnote on this. What they never said is that we're going to have a hospital whose boundaries now are defined by where hospitals are. Because if you do that, you have to justify which hospitals are in and which hospitals are out. And Dr. Daphne said we aren't doing that because I'm considering all the hospitals just for these Bergen County patients. That's the basic. We're not disputing. We're not arguing about how you draw shares in the market. We're arguing about how the market is drawn in the first place. But isn't that sensible if you think about where patients are going? The record bared out like 77% of the residents in Bergen County went to one of the places that were identified. I mean, isn't there a sensibility to that? Not when the question is whether will this merger significantly affect competition. Because what we're talking about here is Englewood joining with HMH. And the question is, if they do that, how is that going to affect competition? And the question there is, well, where are their customers coming from? And the record is undisputed. Half of HMC's customers come outside in 60% of revenue, 58%. For Englewood, it's about 45% of customers, 50% of revenue on that. So if the question, if we're looking to direct effects here, what is this merger going to do? We're no longer talking about a market definition right now. We're just looking at this merger. The question is, what are the constraints on these parties? Who competes for their customers? Who do the insurers play off against them? Right? That's the analysis that has to be done. It's this neat trick. If you just start talking about patients in Bergen County, you assume your conclusion. Yes, a lot of patients in Bergen County go to treatment in Bergen County. But that doesn't answer the question of what's going to happen if these two hospitals merge because they serve patients in other places. And that's the market definition question says, have you drawn an area that's significant and have you included the people who are the strongest competitive constraints? Those are the two questions. The FTC failed the second question, have you included the right people? Its patient-based market ignored competition for half their customers. And its hospital-based market that it wants to switch to but didn't do would ignore most of the competitors. I'd just like to ask one question on the next line. If we disagree with you on the fact that the FTC established a prima facie case, where does this efficiencies question and the pro-competitive factors come in? How do you view it? And what's the extraordinary efficiencies requirement that you have, if you have it at all? Yeah, so the way that would work, Your Honor, is that there are two points then. If we've moved past the prima facie case and now we're on the final balancing, just call the question. There are two things that we point out that the district court erred on. Number one is there's a question, how do you weigh pro-competitive benefits and is it different than efficiencies? Our view on this is that pro-competitive benefits are things like increased quality of care, improved facilities. The district court found those and those types of things deliver direct benefits to patients. There's no efficiencies, on the other hand, is cost savings. And cost savings could enable you to deliver better care to patients if you invest it, but there's a question whether the cost savings are going to be used that way or just to get a bigger margin. That's why this court in Hershey has a different test for efficiencies than for direct pro-competitive benefits. The problem with what the district court did in this case is it found pro-competitive benefits. It said, yes, this will upgrade Englewood's facilities. Your $400 million will do that. It will, and it will improve the quality of care. But then it said, I'm not weighing those in the balance because they have to be extraordinary. That's wrong. The extraordinary language comes from Hershey on this, and it refers to cost savings because you have to go through this longer chain. It also occurred in Hershey because the market concentration there was going to be double here. Like in Hershey, the increase in market competition was going to be as much as the total here, just to be clear. This is the skinniest case the FTC has brought in the last 25 years on hospitals. So that's the efficiencies question, Your Honor. The other basic issue is that if you get to direct effects on this, we're not talking about the market anymore. We're not talking about whether you can improve market concentration. We're going to direct effects, and the insurers testified that adding Englewood to HGMC isn't going to make any difference at all. The FTC's evidence to the contrary is Dr. Daphne's calculation of these price increases. And the way she did that is she looked at where patients prefer to go independent of price, right, because they don't feel the prices. They pick based on what's convenient or what's a really nice facility or things like that. So she calculated a factor there that's called willingness to pay, and then she converted that into how much more insurers would be willing to pay for it. So non-price preferences in there, and she applied this factor. The real problem there is that she relies on one article. It's by a guy named Garvin. He looked at 28 mergers, and when he looked at all 28 hospital mergers, he found there's no correlation between the patient willingness to pay and insurers' prices. If you look at all of them, they're not correlated. They're not closely related. She took a subset out of that that involved nothing from New Jersey, and she applied the subset where there aren't any price savings, and that's what she did. Our expert, Dr. Wu, actually took New Jersey data and say, what Garvin shows is that if you just look at a big picture, there's no necessary correlation. Sometimes it might be related, sometimes not. You've got to look at this market. And the New Jersey data showed there wasn't a correlation. In other words, if you look at New Jersey, there are some hospitals that have higher willingness to pay than others, but that doesn't tell you at all what the insurers are going to pay for them. Some hospitals have higher willingness to pay but get paid less. Some have lower and get paid more. And the reason, you're looking at me, Your Honor, I know the reason, is leverage. Do they have other close substitutes? And here's the thing in New Jersey. There are 24 hospitals within a 30-minute drive, and nobody asks the question which of them are the competitive constraints. Nobody did that analysis here. So you're going to use that to distinguish from Hershey. Oh, sure I do. Yeah. Yeah, they wanted to go out 65 minutes, Your Honor. You said in Hershey, 20 minutes is the benchmark. Yeah, but sometimes people like a country drive. Yeah. You're going to have a hard time finding a country drive in northern New Jersey, Your Honor. I've gone way over my time answering your questions, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. I'm Mary L. Goetz for the Federal Trade Commission. Your Honors, the district court in this case took a proper approach to finding the relevant geographic market fully in line with Hershey. Now, my friend on the other side has just spoken a lot about a theoretical idea that other hospitals outside of Bergen County should be included in the market and might be constraining prices. But the critical thing, Your Honors, is that we're taking the perspective of the insurers in this case. They are the customers. And in this case, the unanimous testimony from all the insurers was that Bergen County patients demand Bergen County hospitals and that those hospitals outside of Bergen County were not relevant as far as the geographic market is concerned. So when the insurers testified in this case, we asked them, could you market a plan that didn't have Bergen County hospitals but did have St. Joe's? The answer was no every time. The same thing with Hudson Regional Hospital, with the other hospitals the other side has pointed to here. So the district court took a very careful approach. It remained laser focused on who insurers would turn to to round out their networks. So you just said to us that Bergen County patients demand Bergen County hospitals. So why would your expert care about other places those Bergen County residents were going? And why wasn't it just focused on the six hospitals in Bergen County? Absolutely, Your Honor. So our expert was clear in testifying that she preferred the patient-based approach to the market because it allows you to basically measure that. Are these more remote hospitals like in New York City, for example? What kind of role do they play here? It allows you to take account of any competitive significance that they might have. And what the numbers showed, and this is at page 342 of the supplemental appendix. This is Appendix D to our experts report. This is the list of all of the patient-based shares of every hospital used by Bergen County patients. And what you see in that list is that no hospital outside Bergen County has any significant share. The key players here are Hackensack, Englewood, Valley, and Holy Name. And that's the same whether you look at the market under a hospital-based approach as the six hospitals in Bergen County or the patient-based approach. And that's really the fundamental thing that my friend on the other side has ignored, is that whichever way you look at it, we're talking about the same key players. So he would say your adversary is incorrect to say a competitor is measured by whether it's an academic institution compared against another academic institution. The competitors are who are getting the patients. Yes, Your Honor, two things. So first of all, that is incorrect because it didn't show up in this case in the facts. The insurers did not say that academic medical centers outside of Bergen County were substitutes for local Bergen County hospitals. And second of all, we heard about things like organ transplants, the most advanced form of hospital care. Those kinds of procedures are outside of the product market in this case. So that's not even relevant to the antitrust analysis in this case. It may be relevant to a different kind of case in a different market, but it's not relevant here. So you said what your expert's definition of the market is, which is where are Bergen County residents going for treatment? But when she did her hypothetical monopolist test, she did it only on six hospitals. Am I correct? Let me just make sure I understand. Am I correct that she only first did it on the six hospitals and did the willingness to pay on those same six hospitals? Yes, so you're correct, but with a caveat. So she looked at the six hospitals in Bergen County only regarding Bergen County patient data. Okay, so this is an apples to apples. This is a smaller subset than if you were going to look at all the hospitals that Bergen County patients go to. And she found that even when you look at that smaller subset, that still passes the hypothetical monopolist test. So it's just a logical extension to say, of course, if you controlled just the six hospitals, you could increase prices. But, of course, if you add more hospitals to that set, to what you control, of course you could. Is that a permissible use of the test? Absolutely, Your Honor. And I think it's shown by in Hershey, what the court did in Hershey, where it said, well, only if you're doing the SNP test, the hypothetical monopolist test, as to whether Hershey and Pinnacle could raise price. And the evidence showed in Hershey that it could, even with that subset. Then, of course, it's true that all hospitals in the Harrisburg area could raise price. And so it's the same kind of logical reasoning that Hershey depended on, and it's entirely proper. Okay. With respect to willingness to pay, do I understand it correctly that, again, she did the willingness to pay analysis on six hospitals located in Bergen County? Am I correct about that? She did a number of different willingness to pay analyses, so yes. She said one was, quote, she needed to pick a small set because it needed to be tractable, otherwise it would explode. Tell me what that means. And how could something explode when you go from six to 24? So I think, Your Honor, it just has to do with the econometric analysis of the data, and obviously you're adding more and more data. It makes those computations extremely hard. I think that's what she meant when she said her model would explode. I think, you know, in this case, the evidence showed that the hypothetical monopolist test of the hospital-based market and the patient-based market, whichever way you want to look at it, both showed that a hypothetical monopolist could raise price significantly. So what the willingness to pay analysis showed for the patient-based analysis was that hospitals could raise, the hospitals in Bergen County could raise price by 28%. That's a huge amount more than the 5% you need for a SNP, for a small, for the price increase we're talking about here that goes to the heart of the hypothetical monopolist test. How do we intersect the hypothetical monopolist test and the willingness to pay? Give me the logical, analytical frame of what you say we're supposed to do. We do hypothetical monopolist, and then we do willingness to pay as a check? So the willingness to pay is a quantitative application of the hypothetical monopolist test. What the willingness to pay analysis measures is the increase in bargaining leverage that either a hypothetical monopolist for geographic market purposes or later in the competitive effects analysis, these actual merged hospitals, what the combination of hospitals, how that changes the desirability of those hospitals from the point of view of insurers, so how it affects leverage. And the court correctly found that substantial economic literature, not just the Garman study, although the Garman study is significant, it's the best of its kind, it looked at actual mergers, but lots of economic literature supports the relationship between increased willingness to pay and increased prices to insurers. And I think that goes to another point I wanted to make, which is that in this case, you know, we heard about price discrimination. Your Honors, the price discrimination argument is complete misdirection. It's not relevant here. And you don't need to just take my word for it. Look at what, 32 leading economists who are specialists in health care antitrust economics, and they're saying that's not required here. Your adversary described the district court's test as patient-based price discrimination market. Was that an accurate description of what the district court did? Not at all, Your Honors. The district court said price discrimination is not a mandate in this industry. That's exactly right. And I think if you step back and look at our theory of anti-competitive harm in this case, so our analysis of the likely price increase that would come from this merger, it didn't depend at all on charging different prices to Bergen County patients than any other patients. It didn't depend at all on price discrimination. And this is the $31 million estimate that our expert put forward. That was based on a plan marketed to patients in the four-county area, so all patients in the four-county area assuming they're charged the same price. And that found that even in that area, the merged entities here could significantly raise price to the tune of $31 million a year. So I think Your Honor mentioned, you know, Kodak was a different case. That was a case where the government's argument in that case was that Kodak's ability to charge different prices in North America showed that it still had market power, and it was trying to rebut the other side's market definition. Our market in this case just doesn't depend on that kind of theory. And that's what the economists say. That's what our expert explained on the stand. What it depends on is this economic significance of Bergen County. And no one denies here that Bergen County is an important area of competition for insurers, and that's the critical piece. Well, you started by saying you're taking the insurer's perspective, but there appears to be a disagreement about what the insurer's testimony was about whether the merger would create competitive leverage, and your friend gave us four or five record sites. Can you address that? Yeah, Your Honor. I think in this case there was not really disagreement in the evidence. One insurer supported the merger. All the other insurers thought it was going to be bad for competition. And I can't mention the name of the insurer because it's under seal, but one of the major insurers specifically testified, this merger is going to increase the leverage that Hackensack has over us. And this person explained that in the negotiations in the past and to date, their relationship with Englewood as far as the bargaining dynamic is a parity one, and its relationship with Hackensack at the bargaining table has been very contentious. And basically what this merger is going to do, this person said, is bring Englewood up to that same level where they would be forced to accept a price increase if it asked for one. So I don't think the evidence is at all unclear on this. Do you have the record site for that testimony? Yes, this is at, just give me a moment, Your Honor. So I think this is at SA234 is one part of the record. It's cited in our brief, but that's the insurer who testified to this, Your Honor. And Ms. Goetz, is that the crux of your case here, that that's just a step too far for Hackensack? I mean, they have 16 hospitals in their system before this merger with Englewood. And now they merge with the 17th. And I'm not anywhere near as familiar with this market as I am with some of the Pennsylvania markets that I've had prior familiarity with. But I just wonder if in the commission's view, if this is a step too far. It makes HMH too dominant and gives them too much leverage in the negotiations. Yes, Your Honor. And I think it's also important to point out that just the effect at Englewood alone is more than enough to make this merger run afoul of the Clayton Act. So, I mean, Brown Shoe itself talked about how successive acquisitions, even if relatively small, which this one is not. It seems to me that those other Bergen County hospitals are actually real firm, real stern competitors to Englewood. You've got the one in Paramus, New Jersey. It's affiliated with Rutgers, and they certainly have a built-in strength of their own. So, Your Honor, what the evidence showed from the point of view of insurers is that the closest competitor to Englewood is Hackensack. And if the insurers own ordinary course estimates of what would happen if they terminated Englewood from their network, where would those patients go? 40% would go to Hackensack. And the evidence showed that insurers are looking at Hackensack, Englewood, Holy Name, and Valley for the most part, the Bergen County hospitals. That's who they're looking at when they're looking at alternatives as they head into these negotiations. So, I think they are close competitors. Your Honor's recognized some previous questions. There's significant direct evidence in this case showing that they're close competitors, that their internal documents recognize them as such. And importantly, and I think this was something that the court found very persuasive, these internal documents showed that a motivation for this specific merger was actually to eliminate and reduce local competition. I can't quote from the documents because they're under seal, but they're cited at page 50 and 51 of our brief. And I think that's really damning evidence that the parties recognize that this merger is going to reduce competition in Bergen County, which is where they're, which is the key area for this case. A question I have for you, another question. When we look at these cases, one of the foundations that you need to look at are the complexities of the market. And all these cases, all the regions are different. You can't compare this to New York City. You can't compare this to Philadelphia. You can't compare it to other places in New Jersey. You may not be able to, you can't compare it to Hershey. But one distinction here between this case and Hershey is in the Hershey case, the Pennsylvania State Attorney General, who was, you know, much closer to the marketplace, not just geographically, but much closer to the marketplace than the FTC would have been, was a co-plaintiff in the Penn State Hershey case. Here in this case, you know, not only isn't the New Jersey Attorney General a co-plaintiff, they're not on the amicus brief of the other states' attorneys general, and they filed a report under their parents patria health care, their health care cost review policy supporting the merger. So I just wonder if somebody who isn't closer to this than the FTC is coming out with a different opinion. And whether we should look at that. I don't think it's at all relevant here. And so, yes, New Jersey has decided to sit this one out. They have not waited. They didn't quite sit this out. I don't think you can actually say they sat this out. Well, they didn't submit an amicus brief in our support. They also did not submit an amicus brief in support of the hospitals. And that's what I mean. But they filed that report. They filed their report. So I want to speak about that, Your Honor. Do you agree with me that they approved the application to proceed under the health care law in New Jersey? That law that they approved the transaction under, that was specifically about the charitable assets. It's about safeguarding the charitable assets of New Jersey nonprofits. They said it was in the public interest. They did, but they were not talking about antitrust, Your Honor. The analysis did not involve looking at the Clayton Act and whether the merger is likely to harm competition. It's really a totally different analysis. And I think that's clear if you look at the actual evidence. This is the CHAPA review process. And the amicus briefs in our support discuss that and talk about how it's just not relevant. I mean, the fact of the matter is that the Federal Trade Commission is the one in this case that has the duty to enforce the Clayton Act. And we're the ones looking at this transaction. It was a unanimous 5-0 vote from the commission to vote out this complaint, to enjoin this merger. So there's no question in our minds that this merger is substantially likely to lessen competition. But following up on Judge Fischer's question, we have an attorney general not joining, an amicus not joining the case, but finding under the charitable assets statute it's an approved transaction. We also have at least one amicus who says this is going to address concerns in this community. And why shouldn't that be a pro-competitive consideration in the balance? Assume we agree with you on the market. And let's assume we agree with you that there aren't extraordinary efficiencies. When we get to that next question about aren't there some pro-competitive benefits, what do we say to that amicus? So I think what we say is the district court had all of that evidence and argument from the hospitals in front of it. And it found that it just did not measure up. It found that the evidence wasn't reliable, that there wasn't enough ordinary course kind of documents and evidence supporting the kind of benefits that they were claiming were going to happen from this merger. And so I think what the amicus for the other side, they're simply parroting back the same kinds of benefits that the hospitals are claiming will result from this merger. But what the cases have recognized, both in Hershey, in Hines, in all the cases that discuss efficiencies and pro-competitive benefits, they emphasize that these have to be held to a very rigorous standard. Because we're talking about a situation where the merger has already been shown in the prima facie case to result in likely anti-competitive effect. And we're talking about even given that presumption, what kind of evidence can rebut it? And what this court said in Hershey is we have to remain focused on the ultimate goal of the Clayton Act, and that is competition. So these supposed efficiencies and benefits need to go to whether the anti-competitive effects are actually likely to happen. What would be an example of those extraordinary benefits? What haven't they shown? Well, Your Honor, I can't really point to anything because no court has ever actually found, no court of appeals has ever found that benefits or efficiencies, however you want to describe them, have outweighed a presumptively anti-competitive merger. And they need to, the court explained in Hershey, it needs to be something that's merger-specific. It needs to be something that's verifiable. It needs to be something that's going to get passed on to the ultimate customers. And here, none of these benefits, the district court found it very persuasive that in the past, Hackensack had acquired another hospital, and had made some of these same claims, sort of pie in the sky, about capacity constraints, and that this acquisition was going to allow them to better allocate their capacity. But reality showed that that didn't end up happening, and that hospital is still operating under capacity, and that's past Hack Valley. We didn't say in Hershey that you had to have extraordinary efficiencies in all cases. We said that there needed to be in that case. Yes, but what you did say, Your Honor, is that they need to be held to the rigorous standard. Yeah, because of the high HHI numbers. Well, I think Your Honor did mention the high HHI numbers, but I don't think the extraordinary requirement for efficiencies is tied to HHIs at the very high level that they had in Hershey. The other cases that talk about this tie that extraordinary language to the fact that you have a merger that's presumptively unlawful, because it's resulting in kind of over that threshold of the 2,500 HHI or the increase in 200. And here, under whichever approach you take, we're well past that threshold. So it's perfectly appropriate that the district court held these claims to a high standard, but really ultimately the evidence and the proof just didn't measure up, Your Honors. Are you saying pro-competitive benefits can never overcome the anti-competitive merger, or you've just never seen it? We've never seen it, Your Honor. You can't say what it would look like, because you've never seen it. Right. I think that's correct. But I think there's a really good theoretical basis for that, which is we're talking about mergers that have been shown that are going to have likely harbored competition. They're going to innovate, reduce quality, all of these things. And what the cases and the antitrust treatises say is that in order to sort of make sense to look at efficiencies, they have to, by definition, be enough to offset that very substantial harm. So we're looking at even a tiny sliver of all mergers, the ones that are in that top group over the threshold for a presumption of harm. So we're already looking at mergers that are, you know, these are really dangerous and bad mergers for competition. So, of course, the claims that some sort of benefits offset that are properly held to a high standard. Let me ask a flip of Judge Porter's question. Mergers occur. What are the circumstances under which a merger is OK and that it advances a pro-competitive interest? Well, what the courts have said is it has to go to competition. So, of course, all mergers, the mergers happen because the parties think they're going to result in benefits. That's sort of built into this, to the analysis. The question is, is the merger likely to substantially lessen competition in violation of the Clayton Act? And what circumstances would that not occur? When would it not lessen competition when there's a merger? Would it not lessen? I mean, it's hard for me to think of any because we haven't seen any real world examples of a merger that's Well, if it's a low HHI number, then it wouldn't, right? Right. I mean, we're talking in this case about a merger that results in high concentration and a high increase in concentration. OK, so that's sort of. And the reason, Your Honor, is that that creates a fundamental structural change in the market and the competition in the market from day one after the merger. And when we're talking about benefits and efficiencies, these are kind of speculative, hypothetical, aspirational. Certainly. But they're not guaranteed. And there's certainly a lot that can come between them being actually realized. And so the court appropriately focused on, is there evidence in the record to back up the idea that these promises are actually going to be met? And it found that there simply was not. Certainly not enough to offset the strong prima facie case that the FTC put on in the district court. So, Your Honor, we would ask that you affirm the district court. We think it properly entered the preliminary injunction to enjoin this merger. Thank you. Thank you for your argument. Your Honor, I'm going to start where my friend ended, which is the concentration numbers which you need for a prima facie case. This one just sneaked by. But the only way you could sneak by in this market is by drawing a market boundary that manipulates the edges and ignores all the close competitors. That's the real problem here. And they do it in one of two ways. In the patient-based market they proposed, they ignored competition for half the customers. And by shrinking the pool of customers, of course, you make the concentration look bigger and they just sneak by. The other way they did it is by, if they want to switch to a hospital base, which like I said, they expressly said we're not doing that below, so they didn't have to try to justify excluding all of them. The Thomas Jefferson case recently, that's what tripped that one up and the district court denied and this court denied the stay. So they're not doing that. They ignore most of the competitors. And here's the basic problem, Your Honor. What you're supposed to do in a merger is you look at the merging parties and you identify the competition around them that will constrain them. You start with the merger and you go out and you justify it that way. What the FTC here is doing is starting with a market, Bergen County, and then trying to fit these parties into it. And the real question, I mean, take a look. We have this map on page 17 of our reply brief. Here's Hackensack and here's Englewood. Why did they go only north and not south and west? And why did nobody ask that question? Didn't they go south when they went to St. Joe's? No, they didn't look at that. Well, that wasn't one of the 24 hospitals where the patients go? That's one of the ones we listed, yeah, but they didn't, if they're switching to including all the patients of those hospitals. So let's be clear. Not all the patients of those hospitals, all where the Bergen County people went. Yeah, their market looks only at the patients in Bergen County but all the hospitals. So it makes these great big hospitals look like they have tiny market share because you're only looking at Bergen County. If you switch to hospitals, you get all of the patients of the hospitals that you're including but nobody else's. There are just two different ways of making this market look smaller than it actually is to juice the concentration numbers. And I want to correct a couple of misstatements the council made. First of all, the district court did not say and Dr. Daphne did not find that HUMC and Englewood are the closest competitors. The district court expressly found that that wasn't done. That's at page 41 of the opinion and Dr. Daphne admitted it at page 831 of the appendix. The other thing council said is that there was one insurer she claimed testified that adding Englewood to HUMC would change the leverage. That's incorrect. The page of the appendix she cited talked about the hypothetical monopolist test. It said if there were a merger of all of the hospitals in Bergen County, would that change the leverage? That's page supplemental appendix 234. Nobody said, and I gave you the sites, nobody said adding Englewood to HUMC would make any difference in the leverage. The representation is not one of the insurance representatives who testified said there would be no impact on leverage. That's your representation? That's your understanding of the records? Yep. Pages 45 and 46 of our brief, Your Honor. We provided citations for that. I'm asking you. I know what you're saying. You're saying to us not one witness said there would be an impact on leverage. Yeah. It said it wouldn't materially change it. It wouldn't materially change it. That's different than saying it has no impact. I'm going from memory, Your Honor. They said it would make no difference. They said it wouldn't change the leverage. They would say we need HUMC, but Englewood doesn't change it. I've given you the specific sites, and I'll do that, Your Honor. The big problem is there are so many hospitals nearby, this wouldn't change the leverage. The first and necessary step to measuring market concentration is you've got to get the market right. You've got to identify the competitors. That wasn't done here, and that's why this should be reversed. Anything else? Thank you, Your Honors.